## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

WELCOME PROPERTIES 201, LLC,

     Plaintiff,

v.                          Case No. 2:16-cv-001301-JCH-SMV

NATIONAL FIRE & MARINE
INSURANCE COMPANY,

     Defendants.

### DEFENDANT'S OPPOSED MOTION TO DISMISS FOR DISCOVERY VIOLATIONS AND SPOLIATION

The Plaintiff in this case, Welcome Properties 201, LLC, has disregarded its obligations to provide Defendant National Fire & Marine Insurance Company with responsive and relevant information, has destroyed critical evidence, and has otherwise failed to make any good faith effort to comply with its obligations to preserve and produce relevant evidence. Deposition testimony and third-party discovery has revealed that Plaintiff has made no good faith effort to respond to National's discovery requests, that Plaintiff has concealed extremely relevant information from National, and that Plaintiff has likely concealed or destroyed an unknowable amount of additional information that National cannot obtain from other sources. Plaintiff's disregard of its discovery obligations is egregious and justifies dismissal of Plaintiff's case as a sanction. Plaintiff chose to file this suit, but has decided that it does not need to meaningfully participate in discovery.

As is explained in more detail below, Plaintiff's spoliation of evidence and failure to comply with its discovery obligations is extremely prejudicial to National's defense. The information that Plaintiff has destroyed and failed to disclose is the evidence that National needs to demonstrate the condition of the roof at issue in this case before, immediately after, and in the months after the hail storm that Plaintiff claims damaged its hotel. Because of Plaintiff's improper discovery conduct, National's knowledge of the condition of the roof is limited to tiny snapshots in time—National's two inspections of the roof during the insurance claims process

and the few documents that Plaintiff chose to (1) keep and (2) actually produce. Had Plaintiff complied with its discovery obligations, National would know on an almost daily basis what issues Plaintiff was supposedly experiencing with the roof as Plaintiff's maintenance employees kept daily logs that would reflect roof maintenance, leaks, and other issues that are critical to National's defense. The destruction of this evidence by Plaintiff has prevented National from ascertaining the true scope of the maintenance issues on Plaintiff's roof and is allowing Plaintiff to dictate the narrative of the case via the testimony of its owner and former employees. Put simply, Plaintiff has destroyed or willfully failed to produce the documents that would rebut or support the testimony proffered by Plaintiff and its former employees, and National is thus extremely prejudiced in its ability to mount a proper defense. Dismissal as a sanction is appropriate as any other remedy would be ineffective to cure the prejudice to National and would reward Plaintiff for its destruction of evidence and failure to comply with its discovery obligations.

## BACKGROUND

### A. General Background.

Plaintiff Welcome Properties, LLC is wholly owned by one person—Raj Singh. In 2005, Mr. Singh purchased a Ramada hotel (the Hotel) in Las Cruces, New Mexico. Mr. Singh's plan was to hold onto the Hotel for a few years and then flip it. Due to the collapse of the real estate market, Mr. Singh ended up holding on to the Hotel for a longer period of time. Over the course of his ownership of the Hotel, the Hotel experienced a number of roof issues. Mr. Singh did piecemeal re-roofing work—likely a result of the fact that he intended to flip the Hotel—by replacing only small sections of the roof and by coating the roof with a substance intended to slightly prolong the already aged roof.

In October 2015, a hailstorm occurred in Las Cruces, NM. According to some of Plaintiff's witnesses, the roof of the Hotel started to leak immediately after the storm. In late 2015 or early 2016, an independent adjuster apparently visited the Hotel and advised Plaintiff to make an insurance claim (something that Plaintiff did not do at or around the time of the

hailstorm). In February 2016, via its Chicago based litigation counsel, Plaintiff submitted a claim to National contending that the roof of the Hotel was damaged in the October hail storm. National responded by sending an independent investigator and a professional engineer to the property. The inspections performed by those individuals revealed that while the roof of the Hotel certainly was leaking, the leaks were caused by serious maintenance defects on the roof, wear and tear on the roof, deterioration of the roof, and the age of the roof. Simply put, Plaintiff's roof had long since exceeded its useable life span and was thus leaking in numerous places. Those leaks had nothing to do with hail. Because there was some cosmetic hail damage to soft metals, skylights, and A/C condenser fins, National partially denied Plaintiff's claim and compensated Plaintiff for those cosmetic damages.

After National partially denied Plaintiff's claim, Plaintiff made a second claim for insurance coverage, again with the assistance of its litigation counsel. This time Plaintiff asserted that a May 2016 hail storm had caused roof damage. National again sent inspectors to the property, but those inspectors found the same maintenance and age related issues that caused the leaks addressed by National on its prior inspection. National thus denied Plaintiff's second claim on July 8, 2016.

**B. Background Regarding the Lawsuit and National's Discovery Requests.**

On October 18, 2016, Plaintiff filed suit against National in state court. National removed the case to this Court, and the parties began litigating the claims. On April 8, 2017, National served Plaintiff with National's first set of Interrogatories and Requests for Production of Documents. National sought documents and information related to Plaintiff's claims and National's defenses—documents reflecting maintenance issues at the Hotel, roof leaks, and other records that bear on the condition of the roof before and after the hail storm, documents related to Plaintiff's claimed damages, and documents related to Plaintiff's 2017 sale of the Hotel. *See* Plaintiff's Responses and Objections to National's First Set of Interrogatories and RFPs, relevant portions attached as Exhibit A. Plaintiff's responses were due on April 8, 2017. Plaintiff did not respond by that date. National's counsel inquired about the status of the responses on May 12,

2017. In response to that inquiry, Plaintiff's counsel asked for an extension, which National granted on the condition that substantive responses were provided along with the requested documents. *See* May 22, 2017 Letter, attached as Exhibit B. Despite having been given an extension to May 19, Plaintiff did not respond on that date thus necessitating *another* follow up from National's counsel. *Id.* On May 24, 2017, Plaintiff finally responded to National's discovery requests and produced 274 pages of documents.

But, Plaintiff's responses contained numerous deficiencies (including making objections which were waived on account of Plaintiff's failure to respond within 30 days to National's discovery requests). The documents Plaintiff produced with its responses included some receipts, some monthly "Manager-Flash" reports (reports showing occupancy levels and other data), financial statements, a representation agreement between Plaintiff and a listing agent, and a handful of agreements related to the 2017 sale of the Hotel.[1] Plaintiff's production included *no* emails, no maintenance logs, no maintenance records other than a handful of receipts, no communications related to the sale of the Hotel, and no documentation regarding rooms taken out of service.

National thus sent Plaintiff's counsel a letter requesting that Plaintiff supplement its responses to include additional information regarding roof related maintenance and information about Plaintiff's purchase of the Hotel and the 2017 sale of the Hotel. The condition of the roof both before and after the hail storms is a central component of this case, and documents related to the purchase of the Hotel (by Plaintiff or by the third-party who purchased the Hotel in 2017) are likely to lead to discoverable information regarding the condition since disclosure of the condition of the roof was likely required as a part of the sale. Similarly, maintenance records are directly relevant to Plaintiff's contention that the roof was in good condition prior to the hail storm, Plaintiff's contention that it sustained damages, and Plaintiff's contention that it experienced leaks immediately after the hail storm.

---

[1]Plaintiff sold the Hotel in March 2017 and thus no longer has any ownership interest in the Hotel or its components.

Over the next several months, National attempted to resolve its concerns with Plaintiff. On July 21, 2017, Plaintiff provided National with some additional records, bates labelled Welcome 1470 to 1771, which Plaintiff's counsel asserted were the requested "records relating to the purchase of the property, maintenance and the HVAC system." *See* July 21, 2017 Email from M. Childress, attached as Exhibit C. Those records consisted of 11 pages of documents related to the 2005 purchase of the Hotel, some HVAC photographs and invoices, a number of checks to Plaintiff's employees (with no descriptive information regarding the purpose of the checks), a handful of receipts, and (most critically to this motion) copies of e-mailed work reports generated by Plaintiff's maintenance employees for a total of only twenty-four days beginning in late December 2015 and ending in March 2016.[2] Some of those work reports contained information directly related to roofing issues. *E.g.* 12/21/2015 Work Report ("Steve and his associate will be visiting the Ramada to inspect the roof for potential hail damage . . ."); 12/28/2015 Work Report ("leaks chased . . . sent pictures of roof with captions"); 2/9/2016 Work Report (""escorted roofers upstairs . . ."), attached as Exhibit D. Plaintiff also produced, for the very first time, written statements of 5 Hotel employees that had been drafted months before Plaintiff's initial discovery responses.

National did not believe that Plaintiff had produced all requested information, and continued its attempts to receive responsive information. On August 1, 2017, Plaintiff gave National access to a storage facility containing hundreds of boxes of documents that Plaintiff's counsel represented as containing "all documents regarding the operations of the Ramada Hotel & Conference Center." August 1, 2017 Email from A. Mitchell, attached as Exhibit E. On August 4, 2017 National's counsel travelled to Las Cruces, NM and inspected the boxes at the storage facility. The vast majority of the boxes consisted of "night audits"—folders containing guest folio receipts and related information that is not relevant to this case.  A handful of boxes

---

[2]Those work reports were dated 12/17/15, 12/21/15, 12/22/15, 12/24/15, 12/28/15, 12/29/15, 12/30/15, 1/4/16, 1/7/16, 1/8/16, 2/4/16, 2/8/16, 2/9/16, 2/24/16, 2/25/16, 2/26/16, 2/29/16, 3/1/16, 3/7/16, 3/8/16, 3/9/16, 3/1/164, 3/15/16, and 3/18/16.

contained receipts for other issues, including some receipts for maintenance related purchases. The boxes contained no documents related to the sale of the Property in 2017, no maintenance logs, no work orders, no documentation of the reasons that rooms were taken out of service, and no emails.

On August 9, after numerous requests by National, Plaintiff finally served supplemental responses in which it withdrew its objections and effectively represented that all responsive information had been produced. *See* Supplemental Responses, attached as Exhibit F. With those supplemental responses, Plaintiff produced for the first time three documents that Plaintiff purports to constitute the basis of its business loss damages. *See* Excerpt of Business Loss documents, attached as Exhibit G. No supporting documentation for the business loss calculations was produced.

### C. Background of National's Discovery of Extreme Deficiencies in Plaintiff's Discovery Responses and Plaintiff's Spoliation of Evidence.

#### 1. Hidden Documents Revealed After Third Party Subpoena

After Plaintiff identified the listing agent that assisted Plaintiff with the sale of the Hotel, National issued a third-party subpoena to that agent. The agent responded on June 21, 2017 and produced 2834 pages of documents related to the 2017 sale of the property (a stark contrast to the handful of documents Plaintiff had produced on this same topic). The agent's production revealed that Plaintiff had withheld a *vast* amount of incredibly relevant information.

Plaintiff began corresponding with the agent in May 2016. Over the next 12 months, numerous emails and documents were exchanged between Plaintiff and the agent that have direct bearing on the sale of the Hotel and, even more importantly, the condition of the roof. In November 2016, Plaintiff received an offer for the Hotel. Over the next several months, numerous communications were exchanged between the buyer and Mr. Singh (via the agent). None of those emails or documents were produced by Plaintiff. While a complete list of what Plaintiff failed to produce would make this brief unduly long, a summary of the most critical documents follows:

a.      A "Property Condition Report" prepared on January 18, 2016 that includes a
section discussing "evidence of past and current roof leaks" and "reports of frequent roof leaks"
and a section stating that "the roof coverings appear to be near the end of their useful life" and
estimating the cost to replace the roof at $410,800; Exhibit H.

b.      An August 8, 2016 email in which Mr. Singh discusses a re-roofing process that is
being completed and hail damage; Exhibit I.

c.      An August 26, 2016 email from Mr. Singh in which he discusses two contractors
who inspected the roof, would be submitting estimates, and stating "neither of them thought it
prudent to rip out the existing roof"—a statement that directly contradicts Plaintiff's position in
this case; Exhibit J.

d.      A September 2, 2016 email from Mr. Singh attaching a re-roofing bid and noting
the company "will be the one I would choose." Exhibit K.

e.      A September 2, 2016 roofing estimate received by Mr. Singh noting that
"maintenance has been poor" and offering to resurface the roof for $121,310.00; Exhibit L.

f.      A December 26, 2016 email to Mr. Singh attaching roofing proposals (signed by
Mr. Singh) and a proposal to hold $150,000 in escrow pending completion of roof repairs;
Exhibit M.

g.      January 17, 2017 emails to and from Mr. Singh regarding leaks in which Mr.
Singh states that it is "just the older section that has a few leaks"—a statement that contradicts
Mr. Singh's position in this case; Exhibit N.

h.      A January 21, 2017 email from Mr. Singh in which he provides a detailed
discussion about roof issues; Exhibit O.

i.      January 27, 2017 emails from Mr. Singh attaching a roofing estimate and noting
that he "had roof repairs done this week"; Exhibit P.

j.      January 28, 2017 emails to and from Mr. Singh about roof leaks and roof repairs;
Exhibit Q.

k.      February 2, 2017 emails to and from Mr. Singh about roof leaks and roof repairs;
Exhibit R.

l.      February 10, 2017 email from Mr. Singh forwarding bids to recoat the roof for
$245,790.14 and $193,879.38.  Exhibit S

The documents that National was able to obtain from Plaintiff's listing agent were directly responsive to National's interrogatories and requests for production including but not limited to Interrogatory No. 4 (seeking the identity of persons with knowledge of the condition of the property), Request for Production No. 4 (documents related to alleged damages), Request for Production Nos. 7 and 8 (documents related to the listing and/or sale of the property), Request for Production No. 10 (communications with Matthew Reeves relating to the condition of the Hotel), Request for Production No. 10 (documents that relate to the damage that is the subject of the litigation). And, the vast majority of the documents were generated during the course of this litigation and even shortly before Plaintiff responded to discovery—a time when Plaintiff undisputedly knew the relevance of the documents and had a duty to preserve and produce them.

**2. Plaintiff's Failure to Produce Spoliation of Evidence Related to the Condition of the Roof and Maintenance on the Roof.**

**a. Electronic Maintenance Logs**

Starting in 2014 or 2015, Mr. Singh required that his maintenance staff send daily maintenance logs documenting maintenance activities at the Hotel via email. Exhibit T, Singh Depo. at 73:13-25. John Kubin was the Chief Engineer at the Hotel and was responsible for repair and maintenance of all the building systems. Exhibit U, Kubin Depo. at 21:8-15. In accordance with Mr. Singh's electronic record keeping requirement, Mr. Kubin, at least when he remembered to, sent a daily email to Mr. Singh regarding all "major" maintenance work that he had performed. Exhibit U, Kubin Depo. at 31:17-33:6.  An example of one of those daily reports is attached as Exhibit D.  Roof issues were the types of major maintenance issues that would go into a daily report. Exhibit U, Kubin Depo. at 55:3-9. While Mr. Singh was the primary recipient of the emails, Mr. Kubin would copy other Hotel employees if the maintenance work impacted their responsibilities. *Id.* at 34:2-18; Exhibit V, Denten Depo. at 14:7-11, 31:19-32:18 (noting that she as General Manager was copied on maintenance emails). Raul Perez, another maintenance employee, also sent daily emails regarding his work. The emails sent by Mr. Kubin and Mr. Perez included work on the roof, leaks from the roof, and other roof maintenance issues.

Exhibit V, Denten Depo. 36:21-37:3. While both Mr. Kubin and Ms. Denten had personal practices of periodically deleting emails, Mr. Singh never asked Ms. Denten or Mr. Kubin to stop destroying emails either prior to or during the pendency of this litigation. *Id.* at 32:1-3; Exhibit U, Kubin Depo. at 37:11-38:2.

Plaintiff claims in this case that roof leaks started immediately after the October 2015 hailstorm and continued through the date on which Plaintiff sold the Hotel in March 2017. Mr. Singh in fact claimed at his deposition that immediately after the October hail storm, his maintenance workers went on the roof and tried to fix leaks and that the roof continued to leak every time it rained. Exhibit T, Singh Depo. at 104:5-105:1.  Mr. Kubin testified that he performed work on the roof shortly after the storm and that would have included this work in his daily maintenance reports to Mr. Singh. Exhibit U, Kubin Depo. at 77:12-21. Mr. Singh testified that one of his maintenance employees tried several times to comb out A/C condenser fins sometime after National paid Plaintiff to comb fins. Exhibit T, Singh Depo. at 130:1-11. In addition to post-storm maintenance logs, Mr. Singh admitted that the Hotel had roof leaks **prior** to the hail storm at issue, and that the maintenance logs would reflect whether an employee "went up on the roof to do anything." *Id.*  at 93:21-94:7.

Given that Plaintiff's maintenance staff were required to send daily maintenance emails, the twenty-four days' worth of maintenance logs that Plaintiff produced in discovery certainly does not come anywhere close to encompassing all information that Plaintiff possessed regarding roof maintenance. Maintenance logs were sent by numerous employees and received by numerous employees, but when responding to discovery Mr. Singh apparently opted only to look in his own email account and made no attempt to ask his employees to look for responsive email, to access his employees email accounts, or to otherwise comply with his discovery obligations.

The few maintenance log emails that Plaintiff produced do not reflect any roof issues prior to the October 2015 hailstorm, do not reflect the alleged leaks and work done immediately after the storm, do not reflect the numerous leaks and roof work that Plaintiff claims occurred between 2015 and 2017, and thus appear to be only a small fraction of the documents that would

have been produced had Plaintiff complied with its discovery obligations. But, these documents are extremely critical to National's ability to defend against Plaintiff's claim.  The condition of the roof prior to, during, and after the hail storm is the very heart of this case. Plaintiff claims its roof was fine before the storm and leaked constantly after the storm. The documents that Plaintiff destroyed and concealed bear directly on this assertion as daily maintenance logs—by Plaintiff's own admission—would show when leaks occurred, what work was done to remedy the leaks, and what other roof related maintenance was performed. Roof-related work logs from prior to the October 2015 hailstorm would tend to disprove Plaintiff's assertion that the roof had no issues prior to the storm. If, as Plaintiff and its witnesses have asserted, roof leaks began immediately after the storm, then the work logs should reflect those leaks and work associated with the leaks. If, as Plaintiff and its witnesses have asserted, roof leaks occurred almost constantly after the storm, then the work logs should reflect that.  Plaintiff's destruction of the work logs was thus the destruction of evidence that is absolutely critical to National's defense and its ability to test the veracity of testimony proffered by Plaintiff and its witnesses.

### b.  Work Orders

In addition to electronic maintenance logs, Welcome's maintenance department received work orders regarding work that was requested by housekeeping, front desk staff, or customers. *See* Exhibit T, Singh Depo. at 100:11-25. The use of paper work orders continued up to the date that Mr. Singh sold the Hotel, but work orders were thrown out by maintenance staff after they completed a task. *Id.* at 75:14-76:12. Ms. Denten believes that work orders from the weeks and months before the sale would have been in a desk at the Hotel prior to the sale, but she does not know what happened to them when the Hotel was sold. Exhibit V, Denten Depo. 39:4-9. Plaintiff did not produce a *single* work order related to the roof, roof leaks, or roof maintenance despite the fact that Plaintiff continued to generate these orders during the course of this litigation. While Plaintiff's practice of destroying work orders shortly after work was performed may explain the absence of work orders from prior to and shortly after the October 2015 hailstorm, Plaintiff had a duty to preserve relevant evidence once it anticipated litigation in this case. Thus, there is no

excuse for the absence of work orders from February 2016 (the date on which Plaintiff's counsel became involved) forward. Plaintiff continued its practice of destroying work orders (which would have direct bearing on Plaintiff's claims) despite its intent to sue National and the pendency of this litigation. These destroyed work orders, like the maintenance logs, go to the very heart of the parties' dispute. The work orders would show roof leak related issues, customer complaints related to roof issues, and other highly relevant information that has a material impact on National's defense.

### c. Alleged Business Loss Documentation

Plaintiff has asserted that it is entitled to lost business damages in this case. In support of this claimed element of damages, Plaintiff produced several documents which summarily identify Plaintiff's alleged damages. Mr. Singh testified that he created the documents, and that his calculations consist of multiplying the number of rooms that he believes were not rentable, the number of days that he believes the rooms were not rentable, and the average rental price of a room. *See* Business Loss Document, Exhibit G; Exhibit T, Singh. Depo. at 235:25-239:9; 241:13-248:18. Mr. Singh was not able to explain which rooms were allegedly out service, what specific time periods were actually at issue, or provide any concrete details about the bases of his calculation. *Id.; and see id.* at 250:2-6 ("I don't know which rooms").

The specific rooms that were out of service on any given day and the reasons that the rooms were out of service is thus a vital part of National's defense against Plaintiff's alleged business losses as that information may rebut Plaintiff's claims regarding which rooms were affected by leaks, the impact non-leak issues had on Plaintiff's business, and the number of rooms and days at issue. Plaintiff had this detailed information, but failed to produce or preserve it for production. Plaintiff has produced daily "flash reports" that contain some information about Plaintiff's Hotel operations. As relevant to this motion, the flash reports identify the number of rooms that are taken out of service for each day. But, the flash reports do not provide any explanation as to *why* any room, much less all of the rooms out of service on any given day, were taken out of order.

While Plaintiff failed to produce lists identifying which rooms were out of service and the reasons for being out of service (something that was responsive to several of National's discovery requests), Plaintiff had the ability to do so. The software could generate a list of rooms, by room number, that were out of service along with a short description of the reason the rooms were out of service for any given day. Exhibit W, Latona Depo. at 42:1-43:11; 65:25-66:11; Exhibit U, Kubin Depo. at 49:8-24. After selling the Hotel, Mr. Singh failed to preserve access to the system that tracked this information. Exhibit T, Singh Depo. at 82:23-84:15. Singh believes that he made a backup of the Hotel computer system around the time that he sold the Hotel, but he does not know where the backup is. *Id.* at 78:11-79:10.

In addition to alleged business losses based on the alleged unavailability of rooms, Plaintiff also claims that it was unable to rent rooms to large groups which impacted its sales. Exhibit T, Singh Depo. at 214:4-215:13. Mr. Singh could not identify any specific instances of such an occurrence, but believed that another employee might know. *Id.* 217:20-218:15. National thus asked Ms. Denten whether she had kept records of the Hotel's efforts to make group sales. Ms. Denten testified "we had folders and folders of groups that came" but that at around the time that the Hotel was sold, all of those documents were thrown away. Exhibit V, Denten Depo. 52:16-54:4. The records that would prove or disprove Plaintiff's claim regarding group business loss and show Plaintiff's mitigation of damages thus were not produced when National requested them *and* were destroyed by Plaintiff during the course of this lawsuit. These records are not only critical to Plaintiff's business loss claims, but also bear directly on Plaintiff's claims regarding the scope of its alleged roof issues—if rooms Plaintiff claims were affected by leaks are not on the out-of-service list, that disproves Plaintiff's assertions regarding the impact of alleged leaks.

### d.  Other Documents That Were Destroyed or Not Produced

In addition to the above broad topics on which Plaintiff failed to preserve documents, destroyed documents, or simply disregarded its discovery obligations, there are a number of other documents destruction, preservation, and production issues that do not fit within any broad category but that are relevant to this motion. Those issues are:

1)      Ms. Denten testified that she kept records of rooms that were comped on account of roof issues.  Exhibit V, Denten Depo. at 63:17-64:7. But about a week before the Hotel sold, Ms. Denten "just threw out stuff" including the records she allegedly kept related to this element of Plaintiff's alleged damages. *Id.*

2)      Mr. Singh received photographs "of roof with captions" from Mr. Kubin on December 28, 2015. Exhibit T, Singh Depo. at 228:9-229:10. But, approximately one-year before his deposition—i.e. shortly after the lawsuit was commenced, Mr. Singh got rid of the phone on which he thinks the photos would have been received. *Id.* Mr. Singh thus did not produce the photographs as he had destroyed them during this lawsuit.

3)      Mr. Singh admitted that he "might have" communicated with Monika Denten about roof issues via email. But, Mr. Singh did not produce a single email to or from Ms. Denten about roof issues.

4)      Mr. Singh testified that he brought a number of roofers to the Hotel in late 2015 or early 2016, and that they might have given him written estimates or proposals. Exhibit T, Singh Depo. at 113:8-11. Singh admitted that he received "four, five" bids for reroofing the Hotel between the time of the hailstorm and the date that he sold the Hotel. *Id.* at 144:4-7. Mr. Singh produced *no* bids other than a highly inflated bid from his expert witness in this case. And while National obtained some bids via its subpoena to the listing agent, National has no way to determine whether those bids represent the totality of bids received since Mr. Singh could not remember which contractors provided bids or when they provided them.

5)     When asked why he did not produce a roofing estimate that National obtained via a third party subpoena---a roofing estimate that was received by Plaintiff just over a month before Plaintiff filed its suit, Mr. Singh testified "I probably threw it out." Exhibit T, Singh. Depo. at 189:13-24. When asked "so after you filed your lawsuit, you got a bid for reroofing, and you threw it away?" Mr. Singh responded "yeah." *Id.* at 189:22-24. When asked why he had not produced a January 2017 email in which he references 20 different roofers that visited the property after the hailstorm, Mr. Singh responded "Well, because I didn't have it. If I had it, I would have provided that. I probably didn't save it." *Id.* at 193:24-194:2. Mr. Singh thus admitted to destroying relevant documents in the midst of this lawsuit.

6)     After testifying that he had brought an independent adjuster to the Property prior to ever making a claim for insurance (something that had not previously been disclosed to National), Mr. Singh questioned his counsel on the record regarding whether he should produce "the independent adjustor email . . or would that be privileged." Exhibit T, Singh Depo. at 111:12-16. Plaintiff never produced a privilege log or any independent adjustor email, even though such an email was responsive to several of National's discovery requests.

7)     When asked about which rooms were out of service on which nights, Mr. Singh testified that he "was involved in the Hotel maintenance, and I used to get emails from my employees or phone calls from my employees or I would go and walk the halls." Exhibit T, Singh Depo. at 248:19-24. But when asked where the e-mails from his employees were, Mr. Singh testified "Well, I didn't save every e-mail. But the ones I did save I forwarded to you. You do have those. So I don't have every single e-mail available - - or saved for every – every time that I sent one to my maintenance guy." *Id.* at 248:25-249:8. Again these emails continued up until Plaintiff sold the Hotel, so Mr. Singh's testimony is admission that he destroyed relevant documents during this lawsuit.

8)      Raul Perez emailed Mr. Singh a written statement regarding his alleged knowledge of roof related issues. Exhibit X, Perez Depo. at 50:6-51:6. While Plaintiff produced the statement, the produced version is not in the form of an email. *See* Perez Statement, attached as Exhibit Y. Thus, Plaintiff failed to produce (and based on other testimony likely destroyed) relevant emails.

9)      Plaintiff's accounting system kept records of all contractors which were issued a 1099 in any given year. Exhibit W, Latona Depo. at 88:2-5. While National was able to locate one printed 1099 vendor list in Plaintiff's storage facility, no other 1099 vendor lists were in the facility and no other 1099 vendor lists were produced by Plaintiff. The list that National was able to locate, however, indicates that Plaintiff had hired roofing contractors in years prior to the hail storm. *See* 1099 Vendor List, attached as Exhibit Z.  Thus, later lists, which were not produced, were responsive to National's request for documents related to roof maintenance (as the lists identify roofing contractors) and National's request for information regarding persons with knowledge of the condition of the roof.

Each of these issues goes to the heart of the dispute between Plaintiff and National. The destroyed or unproduced documents have direct bearing on Plaintiff's assertion that its roof was damaged in the October 2015 hailstorm, would tend to prove or disprove Plaintiff's claims, and would lead to the discovery of other admissible evidence. National was prejudiced by Plaintiff's conduct, and is being forced to litigate with only a snapshot into the truth about Plaintiff's Hotel, the alleged roof issues at the Hotel, and the facts underlying this dispute.

## DISCUSSION

### A. Legal Standard Applicable to Plaintiff's Failure to Comply With its Discovery Obligations.

Pursuant to Rule 37(b)(2)(A) of the Federal Rules of Civil Procedure, the Court has the authority to issue sanctions against a party for failure to comply with discovery obligations.  The sanctions available to the Court include, but are not limited to, prohibiting the disobedient party from supporting claims or defenses or introducing designated matters in evidence, striking

pleadings in whole or in part, staying further proceedings, dismissing the action, or treating the failure as contempt. *See* Rule 37(b)(2)(A)(i) to (vii). In considering the sanctions to impose, the Court should consider "(1) the degree of actual prejudice to the defendant; (2) the amount of interference with the judicial process; . . . (3) the culpability of the litigant; (4) whether the court warned the party in advance that dismissal of the action would be a likely sanction for noncompliance . . . ; and (5) the efficacy of lesser sanctions." *Ehrenhaus v. Reynolds*, 965 F.2d 916, 921 (10th Cir. 1992) (citations omitted). Importantly, "[t]hese factors do not constitute a rigid test; rather, they represent criteria for the district court to consider prior to imposing dismissal as a sanction." *Id.*

Dismissal is appropriate "when a party has willfully or in bad faith disobeyed a discovery order." *In re Standard Metals Corp.*, 817 F.2d 625 (10th Cir. 1987). In the failure to comply with discovery obligations context, willfulness is defined as "any intentional failure as distinguished from involuntary noncompliance. No wrongful intent need be shown." *Patterson v. C.I.T. Corp.,* 352 F.2d 333, 336 (10th Cir. 1965). "Dilatory tactics and callous inattention to pending litigation" can, in a proper case, amount to willfulness. *Id.* Dismissal is thus an available and appropriate remedy. *See, e.g.*, *Durham v. Lappin*, 346 Fed. Appx. 330, 333 (10th Cir. 2009) (holding that the district court did not abuse its discretion when it dismissed a case for the defendant's failure to comply with a local rule regarding pleading forms); *Georgacarakos v. Watts*, 368 Fed. Appx. 917, 918-19 (same); *see also United States ex rel. Jimenez v. Health Net, Inc.*, 400 F.3d 853, 855 (10th Cir. 2005) ("[D]ismissal is an appropriate disposition against a party who disregards court orders and fails to proceed as required by court rules.").

## B.  Legal Standard Applicable to Plaintiff's Spoliation of Evidence.

The Tenth Circuit Court of Appeals has recognized that, as a remedy for a party's spoliation of evidence, the Court may impose restrictions on the admission of evidence.  Such "[a] spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington Northern and Santa Fe Ry. Co. v.*

*Grant,* 505 F.3d 1013, 1032 (10th Cir. 2007).   The Court has wide discretion in imposing sanctions for spoliation. *Aramburu v. Boeing CO.*, 112 F.3d 1398, 1406 (10th Cir. 1997); *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985 (10th Cir. 2006) (concluding that striking of witness testimony was "the least severe sanction that would be appropriate to balance out the prejudice to the defendant").

### C.   Plaintiff's Claims Should be Dismissed on Account of Plaintiff's Egregious Disregard of its Discovery Obligations and Plaintiff's Spoliation of Critical Evidence.

### (1)   Plaintiff's Destruction of and Failure to Produce Maintenance Logs and Work Orders has Prejudiced National's Ability to Defend Against Plaintiff's Claims.

The central dispute in this case involves the condition of the roof on Plaintiff's Hotel both before and after the October 2015 hailstorm.   Plaintiff asserts that the roof was damaged as a result the storm. National disagrees, and contends that while the roof was hit with hail, the leaks and need to replace the roof result from serious maintenance deficiencies and the age of the roof. The condition of the roof, maintenance of the roof, and leaks in the Hotel at various times is thus critical to Plaintiff's claim and National's defense. The timing of leaks after the storm, the frequency of leaks after the storm, and maintenance that Plaintiff performed on the roof is highly relevant and material as the timing and frequency bears directly on whether Plaintiff's roof had pre-existing defects that caused the leaks Plaintiff attributes to the hailstorm.

Given that Plaintiff required *daily* maintenance logs from its maintenance workers, and given Plaintiff's admission that there were roof leaks before the storm and assertion that there were roof leaks immediately after the storm that recurred regularly up until the date on which the Hotel was sold, Plaintiff should have produced a vast number of daily maintenance logs. Instead, Plaintiff produced only twenty-four days' worth of maintenance reports for a period starting months after the storm and ending a year before Plaintiff's sale of the Hotel.   Plaintiff produced *no* maintenance reports from the date of its claim forward, no reports generated during the pendency of this litigation, and no reports from the time period before the hailstorm.   There

are only three explanations for this failure, all of which justify dismissal of Plaintiff's claims: (1) Plaintiff intentionally withheld relevant evidence; (2) Plaintiff utterly disregarded its discovery obligations and failed to make any effort to even look for responsive emails in its possession; or (3) Plaintiff spoliated evidence.

It is clear from deposition testimony that maintenance logs responsive to National's discovery requests were generated before the storm, after the storm, and during the course of this litigation.  Plaintiff's failure to produce anything other than a handful of maintenance logs from December 2015 to March 2016 is likely a result of some combination of all three explanations listed above. Mr. Singh made no effort to have his employees search their emails for responsive documents (even the employees who were sending the responsive emails), he made no effort to search his employees' emails on his own, and thus he grossly disregarded Plaintiff's discovery obligations.  The Plaintiff in this case is a corporation. Thus, when National asked Plaintiff to produce relevant documents, Plaintiff was obligated to do more than simply have its owner, Raj Singh, pick and choose a handful of emails from his own inbox. Plaintiff was obligated to review and produce emails from *all* of its employees that were responsive to National's request. Its failure to do so is a gross and intentional violation of Plaintiff's discovery obligations.

On top of failing to even look for relevant documents, Plaintiff deleted relevant emails even after the hailstorms at issue in this case, destroyed photographs Mr. Kubin took in December 2015 showing the condition of the roof, failed to prevent the destruction of work orders generated after Plaintiff anticipated litigation (which was likely around February 2016 when Plaintiff hired counsel and certainly began shortly before Plaintiff's October 2016 lawsuit), and destroyed bids from roofing contractors that bear directly on the issues in this case.  This conduct is egregious, it is a blatant disregard of Plaintiff's discovery obligations, and justifies dismissal as a sanction.

The egregiousness of Plaintiff's disregard of its discovery obligations was best revealed by the documents produced by Plaintiff's listing agent.  Those documents showed that Plaintiff possessed and failed to produce highly material information—roofing bids showing that the cost

of re-roofing is vastly lower than Plaintiff claims in this case, admissions by Mr. Singh that the roof likely does not actually need to be torn off and replaced, admissions by Mr. Singh that leaks were limited to one section of the Hotel and that the Hotel only had "a few leaks," a determination by a neutral third party that the Hotel roof had poor maintenance, and numerous other communications discussing the roof maintenance and condition that is so critical in this case.

Had National not subpoenaed the third-party listing agent, National never would have known about this highly probative evidence that was plainly responsive to National's discovery requests.  While National was able to obtain some evidence that Plaintiff withheld (despite having represented to National that it had produced "everything"), National will never know what else Plaintiff has failed to produce or destroyed.  This is not a matter of a single document having slipped through the cracks. Rather, the history of discovery set out above establishes that Plaintiff has consistently failed to make any good faith effort to comply with its discovery obligations.  There is likely a vast amount of additional information that Plaintiff has concealed from National, and it is for that reason that National is requesting dismissal of this case. If Plaintiff did not believe that the emails produced by the listing agent were responsive to National's discovery requests despite being (1) generated during the course of the litigation (2)specifically about the cost to replace the roof and maintenance issues with the roof and (3) within the scope of National's discovery requests, then there is no telling what other information Plaintiff chose not to produce.

Mr. Singh admitted that he destroyed relevant emails, he admitted that he failed to preserve relevant documents (like work orders and emails), he admitted that he made no effort to locate emails other than some minimal review of his own email, and he has thus admitted that Plaintiff violated its duty to preserve and produce relevant information in this lawsuit.  National has no ability to obtain the destroyed maintenance logs and work orders (and likely numerous other responsive documents that National is unaware of) from any other source, as Mr. Singh had the exclusive control over access to all of Plaintiff's electronic data and documents.

Plaintiff's failure to produce this information is exceptionally prejudicial to National's defense as National is being forced to litigate with only a small fraction of the relevant evidence that exists (or at least existed prior to Plaintiff's spoliation). Rather than having the ability to rely on daily reports showing the condition of Plaintiff's roof, National has only tiny snapshots of the roof condition. This is prejudicial, and the prejudice cannot be cured.

**(2) Plaintiff's Destruction and Non-Production of Business Loss Evidence Justifies Dismissal of Any Claim for Lost Business Damages.**

With respect to Plaintiff's alleged business losses, Plaintiff's discovery failures and spoliation of evidence justifies dismissal of any claim for lost business. Plaintiff had in its possession documentation of every room that was taken out of service as well as an explanation of the reason that the room was taken out of service.  Given that rooms can be taken out of service for a myriad of reasons other than roof leaks, a review of the daily out-of-service list is critical to National's ability to defend against Plaintiff's claim that it lost business as a result of the roof leaks. The daily details may rebut Plaintiff's claim that rooms were out of service on account of leaks, may show that other issues in fact were the cause of Plaintiff's lost business, and otherwise demonstrate the invalidity of Plaintiff's business loss claims.  Plaintiff's decision to not only not produce but more egregiously to not even preserve the electronic records showing out-of-service rooms and reasons justifies dismissal of any claim for lost business.  National has been prejudiced by Plaintiff's conduct as National cannot now independently assess what rooms were out of service or why those rooms were out of service.  There is no way to cure this prejudice, as Plaintiff's witnesses were unable to explain why any rooms were out of service on any given day.

Plaintiff's failure to produce or preserve material evidence related to its alleged business losses is compounded by Plaintiff's destruction of other records related to lost business. Ms. Denten admitted at her deposition that another employee destroyed the "folders and folders" of documentation regarding Plaintiff's alleged efforts to secure large group business. And, Ms. Denten admitted that she herself—the General Manager of Plaintiff—destroyed documentation

of rooms that allegedly had to be comped to customers on account of leaks.  This destruction of evidence occurred at around the time of the sale of the Hotel (while litigation was pending), was intentional, and justifies dismissal as a sanction.

**(3) Dismissal is the Appropriate Remedy for Plaintiff's Conduct.**

As noted above, dismissal is an appropriate remedy for a party's violation of its discovery obligations when a party intentionally fails to comply with its obligations, when a party has significant dilatory tactics or callous inattention, or when a party spoliates evidence. Given the extreme disregard of its discovery violations and the fact that additional third-party discovery has revealed documents that were plainly responsive to National's requests that Plaintiff chose not to produce, dismissal is appropriate in this case.  National has been prejudiced. National will never know what the unproduced maintenance logs would say about the condition of the roof before and after the hailstorm. National will never know what the daily work orders say about roof related issues. National will never know what the re-roofing bids Mr. Singh threw away might have said about the condition of the roof or the cost to replace. National will never know what the emails between Ms. Denten and Mr. Singh might have said about the roof, what Mr. Perez' email sending his statement said, what roofing contractors might have been revealed by the 1099 vendor lists Plaintiff failed to produce, what the "independent adjuster" email might have said about Plaintiff making a claim for coverage, what Mr. Kubin's photographs depicted, what rooms were comped, what rooms were out of service and why on any given date, what groups were turned away from the Hotel or what efforts Plaintiff made to attract group sales, or any of the other information that Plaintiff admitted it destroyed or did not produce. And that is just the things National knows about. There are likely an untold number of highly relevant emails, documents, and other materials that Plaintiff has concealed via its litigation conduct. If Plaintiff was concealed and destroy evidence that National was aware of, it is highly likely that Plaintiff concealed or destroyed evidence that National does not even know about.

With respect to the *Ehrenhous* factors that the Court is to consider before dismissing Plaintiff's case for discovery violations, National notes that each element but one has been established and that because the factors are a guide, not a rigid test, dismissal is appropriate. First, National has been prejudiced by Plaintiff's conduct. The documents which Plaintiff has failed to preserve and spoliated go to the heart of this case. National cannot obtain daily maintenance logs, work orders, or out-of-service details from another source, and it cannot properly defend against Plaintiff's claims without them. And, if Plaintiff were somehow able to produce what it concealed and destroyed, National would likely have to re-depose many if not all of the witnesses (including experts) as the materiality of daily maintenance logs and other destroyed/withheld information would reveal new areas of inquiry that were not available at the time of the depositions that have been taken.  Second, Plaintiff's conduct has interfered with the judicial process. Plaintiff represented that it produced all documents, but did not. Plaintiff's conduct is a complete disregard of its obligations in litigation—having chosen to sue National, Plaintiff cannot just ignore the requirements imposed by the Rules of Civil Procedure.  The judicial process will suffer further interference as Plaintiff's failures, if they even could be remedied, would require additional briefing, a delay in the trial setting, and additional depositions and expenses. Third, Plaintiff is clearly culpable for its discovery failures and spoliation of evidence. Plaintiff made no attempt to comply with its discovery obligations. Plaintiff made no attempt to ensure that relevant documents were preserved prior to and during this litigation. Plaintiff made no attempt—even after the third-party subpoena response or deposition testimony revealing missing information—to supplement its discovery. Plaintiff intentionally and knowingly destroyed relevant documents. Plaintiff is culpable. Fourth, while the Court has not warned Plaintiff that dismissal is a likely sanction, such a warning is not required and, given the egregiousness of Plaintiff's conduct, is not necessary. This is not a case in which a document or two was not produced. Rather, this is a case in which broad categories of relevant documents were destroyed or withheld.  Plaintiff needs no warning from the Court to know that its discovery conduct was not appropriate and to the extent a warning is required, the

Rules of Civil Procedure plainly provide such a warning. Fifth, lesser sanctions will not be effective. There is no way for Plaintiff to cure its destruction of evidence. There is no way for Plaintiff to cure its failure to preserve or produce relevant information. National has already expended significant resources preparing its case based on the limited information Plaintiff produced. Plaintiff should not be given another bite at the proverbial apple, as Plaintiff had plenty of opportunities (months of correspondence from National's counsel attempting to obtain responsive information) to cure its deficiencies. *See e.g.* Exhibits B, C, and E. But rather than cure its deficiencies, Plaintiff chose instead to make the plainly false assertion that it had given National "everything." Lesser sanctions are also ineffective because lesser sanctions such as barring Plaintiff from supporting its claims, barring Plaintiff from introducing matters into evidence, or striking from pleadings issues related to Plaintiff's discovery failures would have the same result as dismissal. Plaintiff's discovery violation touch every aspect of this case, and dismissal is the only appropriate sanction. Compelling Plaintiff to produce the concealed information would also be ineffective, as the testimony establishes that most if not all responsive documents were destroyed during the course of this lawsuit. If Plaintiff could locate some of the maintenance logs it failed to produce, National would still suffer significant prejudice on account of the numerous relevant documents that Plaintiff destroyed.

Dismissal is also appropriate as a sanction for Plaintiff's spoliation of evidence. There is no question that Plaintiff had a duty to preserve the evidence it destroyed. As early as February 2016, Plaintiff apparently knew litigation was imminent as it chose to hire counsel to make its insurance claim rather than go through a normal claims process. And certainly by April 2016, when National partially denied Plaintiff's claim, Plaintiff knew that it would litigate this issue. But despite this knowledge, Plaintiff intentionally destroyed documents and emails, and negligently allowed the destruction of other documents and emails. Plaintiff made no effort to prevent the deletion of relevant emails, prevent the destruction of work orders, or preserve financial information or out-of-service details. And, Mr. Singh and Ms. Denten and other employees of Plaintiff knowingly destroyed relevant evidence. As explained above, the

destruction of this information is prejudicial to National. Spoliation sanctions are thus appropriate. *See Burlington Northern,* 505 F.3d at 1032 (10th Cir. 2007). Dismissal as a sanction for spoliation of evidence is "clearly within the court's discretion" and may be used to "punish the past wrongdoing and deter future wrongdoing." *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998). Where, as here, a party has been prejudiced by the spoliation of evidence, dismissal is appropriate. Lesser sanctions would not cure the prejudice to National, as a sanction such as an adverse inference has no meaning to the jury where the specific condition of the roof for a long period of time has a direct bearing on National's defenses. That is, simply telling the jury that Plaintiff did not produce maintenance logs from 2015, 2016, and 2017 and that those logs must have been detrimental to Plaintiff's claims does not remedy National's inability to show *how* bad the roof was prior to October 2015, what self-maintenance Plaintiff performed, or the extent to which the maintenance records rebut Plaintiff's claim of constant leaks after the storm.

## CONCLUSION

Plaintiff chose to sue National. But after doing so, Plaintiff apparently decided that it did not need to meaningfully participate in the discovery process, chose to destroy relevant evidence, and thus chose to significantly interfere with National's ability to defend itself in this case. Plaintiff's conduct was willful, it was inappropriate, and it justifies dismissal as a sanction. Plaintiff should not be allowed to engage in the type of conduct at issue here—destruction of numerous types of relevant evidence and willful disregard of its duties to locate responsive documents. Anything short of dismissal will reward Plaintiff for its conduct, and National thus requests that the Court enter an order dismissing Plaintiff's claims in their entirety on account of Plaintiff's gross violation of its discovery obligations.

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: */s/ Jeremy K. Harrison*

Jennifer A. Noya (jnoya@modrall.com)
Jeremy K. Harrison (kh@modrall.com)
Post Office Box 2168
500 Fourth Street NW, Suite 1000
Albuquerque, New Mexico  87103-2168
Telephone: 505.848.1800
*Attorneys for Defendant*

WE HEREBY CERTIFY that on this 23rd day of January, 2018 we filed the forgoing electronically through the court's electronic filing system, which caused the following parties or counsel to be served by electronic mail:

Steven R. Almanzar (steve@ay-law.com)
Joleen K. Youngers (jyoungers@ay-law.com)
ALMANZAR & YOUNGERS, P.A.
P.O. Box 7256
Las Cruces, NM 88006

Michael Childress (mchildress@childresslawyers.com)
CHILDRESS LOUCKS & PLUNKETT
500 N. Dearborn Street, Suite 1200
Chicago, IL 60654

*Attorneys for Plaintiff*

MODRALL, SPERLING, ROEHL, HARRIS
& SISK, P.A.

By: */s/ Jeremy K. Harrison*
Jeremy K. Harrison

*W3126581.DOCX*